# Phipps *versus* Jones.

1. There should be no doubt about the right of an unincorporated religious society to sue on a contract made with it in its associate capacity and for the legitimate purposes of its association, even though there be no persons named or described in the contract as trustees or committee-men on behalf of the society. Such associations since the Act of 1731 have been recognised as having, in law, an associate and quasi corporate existence.

2. An engagement to subscribe for the benefit of a proposed association for the building of a church, is a mere proposal, and revocable until the association is formed; and the subscription is withdrawn by the death of the subscriber before its acceptance.

3. If the association had been formed, and a contract for a lot or for a building had been entered into on the faith of such subscription, in the lifetime of the subscriber and with his express or implied assent, the subscription would have been binding on his representatives.

ERROR to the Common Pleas of *Chester county.*

This was an appeal, entered to January Term, 1850, by the defendants in the action, from the judgment of a justice of the peace, in a suit by B. W. Jones and two others, trustees of the Doe Run Valley Church, *v.* Phipps and Harvey, administrators, &c., of Ellis Phipps, deceased, in which suit the judgment of the justice was for the plaintiffs for $50 and costs.

The plaintiffs declared in *assumpsit,* and the plea was *non assumpsit,* and payment with leave, &c.

The suit was founded on a paper which was signed some years prior to 1849, and was as follows:—

"As the want of a house for public worship in the village of Doe Run has long since been noticed and lamented, and at this particular period a more general feeling is manifested to erect a house for the purpose aforesaid; in order to ascertain the amount of means that could be depended on for this purpose, we, the subscribers, do each of us agree to pay the sums set opposite our respective names, for the purpose of building a house for the purpose and in the place aforesaid, or its vicinity, to be under the control of the Presbyterian denomination of Christians; with the understanding that when, in the opinion of at least *three* of the principal contributors, sufficient money is subscribed to justify the undertaking, they shall give notice to that effect by appointing a time and place of meeting of contributors, for the purpose of choosing a building committee, and making such other regulations as may be agreed upon."

[Phipps *v.* Jones.]

It was signed by about 200 persons, including Jones, G. and A. Mitchell, and Ellis Phipps, the latter agreeing to pay $50.

In June, 1849, after the death of Ellis Phipps, J. M. Thompson drew up a notice purporting to be signed by him, B. W. Jones, George Mitchell, and Andrew Mitchell (but whether signed by the last three named did not appear), which was served on one of the defendants below, who stated at the time that he would not attend. This notice announced that a meeting of the contributors would be held, &c., for the purpose of choosing a building committee, and making such other regulations as might be agreed upon. At the time and place named for the meeting of the contributors, neither of the defendants below attended, and but eight persons were present, who proceeded to elect Benjamin W. Jones, George Mitchell and Andrew Mitchell a building committee, and then declared them trustees of the funds contributed, and to be invested with all the rights of the contributors for their use, and to have the whole power of the contributors for the purpose of collecting the money then subscribed, or which might thereafter be subscribed, in such manner as they might deem advisable. The persons thus appointed the building committee selected the site for a church, *and erected the building.* Suit was then instituted against the defendants below to recover the $50 alleged to have been subscribed by Ellis Phipps. The defendants below contended that there was no promise which would bind the intestate during his life, or his representatives after his death; that there were not mutual promises, and, at most, the subscription was but a promise of a gift, which could not take effect till the delivery of the thing given.

On the part of the defendants a number of points were submitted, the first of which was, that to every contract there should be parties who have given their reciprocal or mutual assent to the performance or non-performance of some act. 2. That the paper signed did not contain the names of parties with whom any agreement was made, or to whom the money was to be paid. 6. That the paper was merely experimental, contemplating a future agreement between the subscribers, which was never made. 8. That *the decease* of Phipps, before the time appointed for the meeting of the subscribers, rendered it impossible for him to attend, and no action could be maintained against his representatives. 10. It was not shown that any three of the principal contributors, before the meeting was called, came to the conclusion that sufficient was subscribed to build the church, and that such fact should have been shown.

HAINES, J., *inter alia,* charged the jury that the death of Phipps, previous to the time when the meeting was called, did not discharge his estate from liability, he never having erased his name from the paper. Notice of the intended meeting was given to one of the defendants; and there is no evidence that others of

the subscribers, not notified, have complained. That *a moral consideration* was sufficient to support a promise, and that, where several promise to contribute to a common object, the promise of each is a good consideration for the promise of the others.

He further charged, that it was not material that the subscription paper did not contain the names of persons to whom payment was to be made. There was a provision for the call of a meeting to carry out the object, and the plaintiffs were appointed to build the church and receive the subscriptions. There were therefore, substantially, parties contemplated, and authority given to raise them when their services were required. He referred to the opinion of Chancellor WALWORTH in the case of Stewart *v.* The Trustees of Hamilton College, 2 *Denio* 413.

Verdict for $50 damages.

The charge was excepted to, and various errors were assigned to it.

*Lewis* and *Hickman*, for plaintiffs in error.—It was contended that error existed in the charge as it respected proper parties to the paper. That no action could be maintained on an instrument unless it showed to whom the money is to be paid, and unless there be mutuality: *Henry Blackstone* 608; 1 *Salk.* 197; 1 *Breese* 155; 11 *Mass.* 113; 8 *Id.* 132; 12 *Johns.* 190; 2 *Pick.* 579, the case of subscriptions for the rebuilding of an academy. The opinion of the chancellor in the case of Stewart *v.* The Trustees of Hamilton College was said to have been overruled. See 1 *Comstock* 581.

It was observed that nothing was stated in the subscription paper as to the appointment of persons to receive payment. The meeting contemplated was to choose a building committee, and make such other regulations "*as may be agreed upon.*" The consent of the defendants was necessary to render the action of the meeting binding on them: 1 *Caine's Rep.* 585; 4 *Johnson* 235; 7 *Id.* 87; 9 *Wend.* 336; 21 *Id.* 141; *Story on Con.* 448; 2 *Pick.* 580. The private judgment of each subscriber was to be exercised in the matter.

Notice of the proposed meeting should have been given to the subscribers generally, and the notice to about the tenth of the whole number was without effect as to those who did not attend.

*P. F. Smith*, for defendant in error.—It was alleged that notice of the proposed meeting was given to all of the contributors in the neighborhood, and that the notice to one of the defendants who refused to attend was binding on them: 9 *Barr* 254; 2 *Jones* 128.

[Phipps v. Jones.]

A mutual promise amounts to a sufficient consideration: 2 *Kent* 465; *Chitty on Con.* 46–63.  Reference was made to the following cases of promises or subscriptions, viz., 2 *Denio* 417; 20 *Johns.* 89, McAuley v. Billenger; 12 *Mass.* 192; 6 *Pick.* 427–433; 3 *Barr* 416; 5 *Pick.* 228.

The opinion of the Court was delivered, January 27, 1853, by

LOWRIE, J.—There ought to be no doubt about the right of un-incorporated religious societies to sue on a contract made with them in their associate capacity and for the legitimate purposes of their association, even though there be no persons named or de-scribed in the contract as trustees or committee-men on behalf of the society.   Such associations have always, and especially since the Act of 1731, been recognised as having an associate and quasi corporate existence in law, with power to hold land and build appropriate houses, and of course with power to acquire rights by contract, and to vindicate them.   And if the English common law forms are insufficient for such cases, we admit the infusion into our law of the plain equity principle that allows a committee of volun-tary societies to sue and be sued as representatives of the whole: 1 *Bro. C. C.* 101; 13 *Ves.* 544; *Story's Eq. Pl.* § 116.   There is, therefore, no difficulty about sustaining this action, if it has a contract to rest upon.   In the case of Chambers v. Calhoun, 6 *Harris* 13, the congregation had been already formed, and the contract of subscription was for the purpose of erecting a new church, and it contained a promise to pay to the building com-mittee, which had not then been appointed, and, when appointed, the promissor was one of them; yet the action against him in the name of his fellows, on behalf of the congregation, was sustained.

In the present case the association was not finally formed, nor the erection of a house concluded on, until after the death of Ellis Phipps, one of the subscribers; and these facts raise the question, was there a complete and binding contract at the time of the death of Ellis Phipps?   If there was not, his administrators are not bound by it, and they would have no right to make it complete. They are bound to perform his contracts, not to complete his proposals.

This subscription paper refers to the general desire to have a house of worship, and declares that "in order to ascertain the amount of means that could be depended upon for this purpose," the subscription is made, with the understanding that, when enough is thought to have been subscribed, a meeting of the contributors should be called "for the purpose of choosing a building com-mittee, and making such other arrangements as may be agreed upon."

Here was no association, when the subscription was commenced, to whom a promise could be made.   The paper was itself the first

[Phipps *v.* Jones.]

step towards the formation of an association, and the means of ascertaining its feasibility. It sets out as an experiment, and we cannot say that there was a complete contract by the first, or second, or twentieth, or even by the last subscriber, unless we can say that there was an association formed by them that could claim its performance.

There can be no contract without correlative parties, and it is generally essential that there be something more than a moral duty as the bond of the relation and basis of the promise. Where the undertaking is entirely one-sided, there is no right of enforcement. There can be no relation without correlation. An engagement to subscribe for the benefit of an association is necessarily a mere proposal, and therefore revocable, until the association is formed. It is a promise of each for the benefit of the associate whole, and remains unattached and incomplete until the association is complete. Until then there is no one to accept the proposal, and, in this case, it was withdrawn by the death of the subscriber before its acceptance. After his death his administrators could not and ought not to regard the proposal as open to acceptance. If, however, the association had been formed, and a contract for a lot or for a building entered into, on the faith of such subscription, in the lifetime of the subscriber, and with his express or implied consent, he, and of course his representatives, would have been bound to pay the subscription.

As these views entirely disallow the cause of action, it is unnecessary to consider the other points of law raised on the trial.

Judgment reversed.