# Brendle et al. versus The German Reformed Congregation of Jackson Township et al.

A conveyance of land to trustees, in trust for the use of a religious congregation, for the benefit of its poor, for a place to erect a church, and for a burial ground, vests an executed legal estate in the congregation itself, not by way of charitable use, but in absolute ownership.

The designation of the uses for which the land is granted, does not limit the estate of the congregation; but simply recognises the uses for which, by law, they may hold the land.

APPEAL IN EQUITY from the Common Pleas of *Lebanon county.*

This was a bill in equity by Joseph Brendle, Joseph Richards, and Henry Stump, members of the German Reformed Congregation of Jackson township, Lebanon county, against the said congregation and Daniel Musser, and others, its trustees, to restrain them from mortgaging certain real estate belonging to the said congregation, and held by them in trust for certain specific uses.

The facts of the case are fully stated in the opinion of the court below, which was delivered by PEARSON, P. J.:—

"From the bill, answer, and concessions on the argument, the facts of this case appear to be substantially as follows: On the 10th day of December 1745, Casper Wistar sold one hundred acres of land, situate in Tulpehocken township, Lancaster county, to Valentine Hergelrood, Adam Deffenbach, Francis Wenrich, Jonas Lerue, Henry Bassler, and Bartholomew Sheffer, for the consideration of £40, and executed to them a deed conveying the property in fee simple. On the 26th day of March 1746, the grantees above named executed a declaration of trust, under their hands and seals, in which they set forth that the land was granted to them by direction and appointment of the members, or persons belonging to the Dutch Reformed Church, or Congregation, in the township of Tulpehocken, and stating that they hold the same in trust for the following use : ' That is to say for the benefit, use, and behoof of the poor of said Dutch Reformed Congregation, at Tulpehocken aforesaid, for ever ; and for a place to erect a house of religious worship, for the use and service of the said congregation ; and if occasion shall require, for a place to bury their dead.' Covenanting also to convey the title to such person or persons as the congregation shall direct, and stating that they have no right to, or interest in, the land in their own behoof, but only as trustees of the congregation. From the form of this declaration, and the method taken to make the title, we have no doubt but that the congregation furnished the purchase-money, and the grantees originally took the conveyance for its use. A church was built upon the land, and a portion dedicated for a grave-yard. The premises were improved from time to time, a farm cleared and cultivated, a mill, dwelling-house, and parsonage built, and the property held in the same way, so far as we can gather, until the year 1805, when the congregation was incorporated by the action of the Supreme Court, and the charter issued on the 17th day of December, in the same year. On the 10th day of February 1846, this charter of incorporation was revoked, and the Congregation was incorporated by an Act of Assembly. The entire equitable title to this land has been in the congregation for over one hundred years, and as more than fifty years have expired since it was originally incorporated, we are bound to presume that it holds the legal estate also. After a long user of property by a corporation, the law will presume that the trustees have transferred to it the legal title: 7 *Paige* 77. Without any formal transfer by the trustees, we are inclined to believe that the legal title would vest in the corporation immediately on its creation ; and in Pennsylvania it is considered of little moment, the law in all cases looking rather to the *use*, than the mere legal estate. We are not wont to consider who holds the deed, but for whom it is held, and treat the *cestui que use* as the party in interest. We are satisfied, that the congregation in its corporate capacity, held the

entire title, both legal and equitable, to the hundred acres of land, at the time this proceeding was commenced. The question to be determined in the present case is, on what trust and condition did it hold it?

" There is nothing even tending to show that any portion of the proceeds of the land was ever appropriated to the poor of the congregation, either before or since it was incorporated by law. On the contrary, it was admitted on the argument, that it was always applied, either to the improvement of the property, or the maintenance of the clergyman. The fact is conceded, that as the country became more densely peopled, and the congregation increased, a majority of the members resided in or near Myerstown—a distance of two and one-half miles from the premises. On the 12th day of March 1853, at a regular church meeting, duly called, it was *unanimously* resolved by the congregation, to pull down the old church, erected on the land in dispute, and build a new one on its site; and also to erect a new church in the village of Myerstown, which was to be considered a branch church of the same congregation, and governed by the same officers. Pursuant to that resolution, the trustees contracted for the erection of the two churches, which were completed during the years 1853, 1854, and 1855, at the expense of some $12,000, or upwards; which was principally done on the credit of the property held by the congregation. The trustees resolved to borrow $6000, for the purpose of building the church in Myerstown, and submitted the project to a vote of the congregation, which was duly convened for that purpose, and the resolution adopted by a vote of 55 in favour, to 18 against the resolution. It is averred, that the congregation still owes about $11,000 for the building of the two churches, and the trustees claim that the debt is already binding on the estate of the corporation, and admit that they intend to secure it by mortgage on the property in dispute, or sell a portion of it for the purpose of making payment. Is it our duty to restrain them? A court of chancery is in duty bound to protect the rights of the minority of a corporation from every threatened injury of a majority, if attempted in violation of law or the terms of the charter. The Act of Assembly under which this congregation is incorporated, provides, 'that it shall be able and capable in law and equity to take, hold, and receive to them and their successors, for the use of the said corporation, lands, tenements, goods and chattels, of whatsoever nature, kind, or quality, real, personal, or mixed, *which is now*, or shall hereafter become the property of said corporation, or to be held for their use, by gifts, grants, bargains, sales, conveyances, devises, or bequests, or otherwise, from any person or persons whomsoever capable of making the same; and to *grant, bargain, sell, mortgage, or dispose of the same for the use of the said corporation. Provided, however,*

that the said corporation shall not have power to dispose of, alien, sell, or in any way encumber the said real estate belonging to the said congregation, without first giving notice to the congregation and stating their object, and if a majority of the members present at the next meeting, after such notice has been given, shall consent thereto:' *Pamph. Laws* 1846, p. 98. This act gives the board of trustees representing the corporation, full power to do all of the acts which we are now asked to restrain, provided the legislature had the constitutional authority to confer it.    That it is the duty of the courts in this state to declare void any statute authorizing property to be diverted from the purpose for which it was bestowed, to charitable uses, we consider clearly settled in Brown *v.* Hummel, 6 *Barr* 86 ; Plymouth *v.* Jackson, 3 *Harris* 44.    A duty which we shall never hesitate to perform on fitting occasion.    That the legislature has the constitutional power to raise up trustees to take charge of a charity, incorporate those persons for whose benefit it was given for the same purpose, or authorize it to be converted into other property for the same use, we think equally clear.

"In the state of New York such conversion is authorized by a general statute, to be made under the supervision of the Court of Chancery ; 7 *Paige* 77 ; 3 *Edw.* 155.    That which may be done under a general law can be authorized by a special statute ; and acts may be lawfully performed by the action of a corporation—the beneficiary, and receive the subsequent ratification of a court (provided the statute so direct), with the same force and validity as if previously approved.    It is contended, in the present case, that the Act of Assembly incorporating the congregation, can give no additional authority to that conferred by the deed under which this charity is held.    There is nothing in the original conveyance of the hundred acres of land, even tending to show that Casper Wistar conveyed it to the persons therein named as a charity, or for any such use or purpose.    On the contrary, it purports to be an absolute sale, for a full and adequate consideration, without any trust whatever.    When the congregation became the owners of the property, through the purchase of their trustees, they had a right to give it such direction as they thought proper—authorize it to be sold again, held. for the erection of a church, a school, a burial place, or any other useful purpose, and the profits to be applied to the support of the poor, the endowment of a school or college, the support of the minister of the congregation, the improvement of the land, or the building of churches.    It was their own, and they could control it.    They gave it a direction by the deed of trust, and with that direction their successors must substantially comply.    We are, however, of the opinion, that by the unanimous consent of the trustees and *cestuis que trust*, a different direction could be given to

the estate.   It was their own, and if all parties in interest were agreed, the object could be changed.   A charity must be accepted on the terms on which it is given, or relinquished; it cannot be altered by any new agreement between the donor and donee, or converted to any other purpose: 2 *Story's Eq. Juris.* § 1175; 1 *Vern.* 43; *Eden* 55; 1 *Atk.* 356; 1 *Eq. Abr.* 99.   But that doctrine must be applied to gifts, not to purchases—to matters in which the public are interested, not to private rights; or to cases in which the rights of others have grown up under the agreement. It would otherwise counteract a legal maxim applicable to such cases—*Modus ligendat directioni.*   We cannot hold these corporators, or the congregation out of which the corporation was formed, to a literal compliance with the deed, without probably running counter to what was done by all parties, by mutual consent, for over one hundred years.   The deed declares that they hold the land for the use of the poor of the congregation, and as a place to build a church and bury the dead.   A comparative small space was used for the two last-named purposes, and no part of the profits derived from the land has ever been applied to the use of the poor of the congregation, but on the contrary has always been appropriated to the support of the minister, building the church, or improving the ground.   There is no provision in the deed, in terms, authorizing any part of the profits of this land to be applied towards the erection of the church, or enclosing or embellishing the grave-yard, still less to the support of the ministry.   By what authority, it may be asked, has the money been so appropriated, and was the application a diversion of the fund? For us so to decide, would be complying with the letter of the deed, but might not be carrying into effect the intention of the original contributors, and would certainly counteract the present desire of all the parties in interest.   It might be beneficial to the people of Lebanon county at large, who are by law bound to support the poor of this congregation, as well as all other paupers within its limits; but would not profit those or their descendants who originally advanced the money.   It is more than probable, that there has never been a pauper, the legal offspring of the substantial genuine farmers, who originally founded this congregation, or their descendants, during the century which they have held the land, and most probably will not be during the coming century.   Why, then, should the congregation be deprived of the benefit of their property for a purpose which may never arise? Or if, by possibility, it may happen at some future period, why may they not appropriate it in their own way in the mean time?   The plaintiffs, in their bill, do not desire that the profits of this farm and mill shall be dedicated to the use of the poor of the congregation, in ease of the county of Lebanon, but on the contrary, as we understand from the arguments of the counsel, wish the

[Brendle *et al. v.* The German Reformed Congregation *et al.*]

same to be continued, as heretofore, in support of the clergyman, the improvement of the premises, and building the church on the land. More than fifty years since, the Supreme Court of this state, after an inspection of the instrument by the attorney-general, granted a charter to the congregation, authorizing the trustees to collect and receive the rents and profits to be derived from this tract of land, and therewith to keep the property in repair, erect buildings, and pay the resident minister. Such an act and authority shows that the highest judicial tribunal of the country did not then consider such an application of the money was a violation of the trust. The instrument, it is fair to presume, was prepared by the members of the congregation, received their unanimous sanction, and was acquiesced in and acted under for over forty years. Is there anything in the deed of trust, which would justify or require this court to restrain the corporation from erecting a church with the funds derived from the land in controversy, in such place as shall be most convenient for the congregation ? By the common law, every corporation aggregate had an unlimited power over its property, and might alienate the same in fee, or grant any lesser estate therein without limitation : *Coke Lit.* 44 a ; *Id.* 300 b ; 1 *Sid.* 161 ; 1 *Barr* 221. The only excepted cases from this general principle are, where they are restrained by their charter, or the character of the grant under which it is held. There is no restraint by the charter in the present case, but on the contrary, it is fully enabled to sell or mortgage all its real estate. The grant is for a charitable use, and therefore a restraint on alienation may be tolerated, which is contrary to the principle which prevails in the case of a grant in fee to an individual for his own use. Such restraints are contrary to legal policy.

" There is, of late, a growing hostility against fettering the free conveyance of estates, even when held for purposes of charity, except where the character of the object requires that they should remain unalienable. The leaning of the courts is to favour alienation, where the objects of the charity may be promoted by a conversion of the real estate into money, though great care is observed to prevent the fund from being diverted to other purposes. In Griffitts *v.* Cope, 5 *Harris* 96, it was held, that land, devised for the purpose of building a meeting-house, might be sold, and the proceeds applied to the same uses as originally described. That case we consider stronger against the` power of alienation than the present, as the title commenced by gift, for a special purpose. Here it was purchased in fee, with the money of the congregation, and the purpose afterwards declared by a writing, which, in our opinion, might have been rescinded at any time by general consent. The power of alienation, when authorized by law, though in apparent contravention of the original grant, was again fully recognised in Barr *v.* Weld, 12 *Harris* 84. Land

[Brendle *et al. v.* The German Reformed Congregation *et al.*]

given for the purpose of building a school-house, it was there held, vested by law in the school directors, and might be sold by them, and the funds applied to the same purpose elsewhere. *A conversion was not a diversion.* The same principle is recognised in 5 *Watts* 495. In Alexander *v.* Slavens, 7 *B. Monroe* 351, it was held, where a lot was conveyed by deed to trustees for the use of certain churches, the Methodists to occupy it two weeks of every month, and the other denominations the rest of the time, that the Methodists might sell their interest, provided the money raised was applied to the erection of another church for that denomination, as thereby the object of the charity was promoted. In Attorney-General *v.* Warren, 2 *Swanst.* 318, it was held, that an alienation would be allowed, when, in the opinion of the court, the charity would be promoted. In Attorney-General *v.* Glyn, 12 *Sim.* 84, it was held, that the court would order a sale of property given for a charity, when it was comparatively useless for that purpose, and direct its investment in that which would better promote the object. In Penfield *v.* Skinner, 11 *Verm.* 296, it was declared, that a proper disposition of the funds of a voluntary charity would be enforced according to the will of the majority, if the same was not unequitable. Whilst we fully recognise the doctrine of these cases, the general principle must be conceded, that it is the duty of the court to restrain the majority of the trustees of a charity, whether incorporated or private, from applying the funds to any other use than that for which they were given, especially if a minority, however small, dissent. It may be well questioned, whether the unanimous consent would make any difference in many cases which might be imagined. It has long been held, that the doctrine of *cy pres* has no footing in our system of jurisprudence, but it may admit of question whether it is not partially introduced in some cases by the Act of April 26th 1855. It is not necessary to determine that point at present. After the most careful consideration which we have been able to give this case, we have come to the conclusion that the congregation, through its corporate officers, has the legal right and authority to sell, mortgage, or encumber the hundred acres of land in controversy, for the purpose of building the church in Myerstown, as well as the one on the premises, except so far as such sale, mortgage, or encumbrance might affect the place for burying the dead, or the church itself. We are of opinion, that they should be exempted from any transfer or encumbrance whatever. We do not consider that any founders of this charity intended that their bones or those of their descendants should ever be sold or mortgaged to strangers, under any pretext of expediency or necessity; nor do we believe that, whilst a portion of the congregation reside in the vicinity, should the church, built on this land for their benefit, be sold or encumbered. We think the distinction is plain and

broad between that portion of the property held for a church and grave-yard and that used for ordinary secular purposes, and from which the congregation is to derive an annual profit.  We fully agree with all the sentiments so beautifully expressive by Mr. Justice WOODWARD, in Brown *v.* Lutheran Church, 11 *Harris* 495, and believe with him, 'that the resting-place of the dead should be hallowed ground.'  We hold that the ground once given for the interment of a body is appropriated for ever to that body. It is not only the *domus ultima,* but the *domus æterna,* so far as eternal can be applied to man, or terrestrial things.  Nothing but the most pressing public necessity should ever cause the rest of the dead to be disturbed.  We believe it our duty to restrain, by injunction, this congregation from selling, or encumbering by mortgage or judgment, so much of the hundred acres of land described in the bill as has been set apart for a grave-yard; and as the same might be insufficient in size for the purpose, or not specifically designated, we shall appoint a suitable artist to lay off the ground intended to be embraced by the decree.  We also deem it improper to sell or encumber the church built on those premises.  If encumbered, it may be sold to the great inconvenience of the worshippers, and contrary, as we believe, to the intention of the founders.

" This congregation is possessed of an ample amount of real estate to pay its debts, and carry out every contract made by the trustees of the corporation, without disturbing the place of worship, or the resting-place of the dead.  The defendants have also been asked to account for certain rents, received from time to time, and for money obtained from the sale of timber.  From what has already been stated in this opinion, it may be readily perceived that we do not consider them to be obliged to account therefor. It does not appear that there has been any misapplication of the money, but the same has been applied for the benefit of the congregation, and the general object of the charity.  If the facts be stated in the answer, and not gainsayed either in the bill or replication, it may admit of grave question whether the plaintiffs, and all the other members of this congregation, are not precluded and estopped from complaining of the action of the corporation in any of the particulars set forth in the bill.  They appear, by general consent, to have obtained the charter of incorporation in 1846, and to have acted under it without objection till 1856, although it contained no express authority to sell, mortgage, or encumber all the real estate of the congregation.  They agreed to a sale of the lime quarry and woodland, part of the premises; to the contract for building the new churches, and to the appropriation of part of the money received from rents and sale of wood, to its payment, so far as a failure to object to the annual settlement of the accounts, embracing those items, may be construed into an

[Brendle *et al. v.* The German Reformed Congregation *et al.*]

agreement. If men will not speak and assert their rights when equity says they ought to speak, they shall not be permitted to speak when equity says they ought to be silent. If it was intended to make any objection to the church property being encumbered for building the Myerstown church, the dissenting members of the congregation should have spoken when they knew the trustees were about making the contract, more especially when it was submitted to the congregation, and a vote taken. They should have acted promptly, and spoken decisively in opposition to the measure. We do not say that any objection could have availed; but if it was ever intended to raise a difficulty, it should have been done before the contracts were made and the debts incurred.

"Decree.—And now, to wit, this fifth day of March 1858, this cause came on to be heard on the bill, answer, and replication, and was fully argued by counsel, and was held under consideration by the court until this twenty-third day of April, in the year aforesaid: Whereupon, it is now considered and decreed by the court, that the said defendant, The German Reformed Congregation of Jackson township, Lebanon county, its officers and agents, the trustees thereof, to wit, Daniel Musser, David Kintzle, Joseph Diehl, Peter Stout, and William Tice, and their successors in said trust, be perpetually enjoined from selling, mortgaging, or encumbering so much of said hundred acres of land described in the bill as was laid off and surveyed by Isaac Hoffer, Esq., as is marked with the letter (A) on his draft, filed in the present case, and endorsed and approved by the president judge of this court, under whose order the same was made, and containing five acres thirty-one perches, embracing the necessary ground for a place for burying the dead of said congregation, so much of the church as is situated on said hundred acres of land, and the necessary curtilage appurtenant to said church. And it is ordered and decreed that the said corporation, its officers, agents, and trustees, have full permission and authority to sell, mortgage, or encumber the whole residue of said hundred acres of land not embraced in the survey of five acres thirty-one perches (the draft of which is filed on record, and made part of these proceedings), as they may find necessary to pay or secure the debts already contracted for the erection of the two churches described in the bill and answer. The money so raised or secured to be equally applied to the payment of the debts existing against or contracted for the two churches situated at Myerstown, and on the premises aforesaid, until the whole thereof is fully paid and satisfied, or for such other use and purpose as said corporation, its trustees, and the majority of the congregation at the stated meetings, and in the method prescribed by the charter, shall determine the most beneficial for said congregation; provided the same comes within the intention of the founders of the charity, and the terms of the charter of

incorporation, but for no other use or purpose whatever. And so much of said bill as demands an account of the rents and profits derived from the land, or the sale of timber cut thereon, as was expended in building the church at Myerstown, is hereby dismissed. The court refuses to decree costs or expenses by either party as against the other, and orders and decrees that the defendants pay the docket costs as lawfully taxed, including all the fees to the officers, out of the funds of the corporation; and also the reasonable charge of the artist, Isaac Hoffer, for making the survey described in this decree."

From this decree the present appeal was taken.

*J. W. Ulrich,* for the appellants, cited Means *v.* The Presbyterian Church, 3 *W. & S.* 303; Brown *v.* Hummel, 6 *Barr* 86; Plymouth *v.* Jackson, 3 *Harris* 44; Martin *v.* McCord, 5 *Watts* 493; Kirk *v.* King, 3 *Barr* 436; Penfield *v.* Skinner, 11 *Verm.* 296.

*L. Kline* and *McMurtrie,* for the appellees, cited Attorney-General *v.* Stewart, 2 *Mer.* 163; Witman *v.* Lex, 17 *S. & R.* 92; Pickering *v.* Shotwell, 10 *Barr* 23; Brown *v.* Lutheran Church, 11 *Harris* 495; School Directors *v.* Dunkleberger, 6 *Barr* 29; Plymouth *v.* Jackson, 3 *Harris* 44; Griffitts *v.* Cope, 5 *Id.* 96; Barr *v.* Weld, 12 *Id.* 87; Attorney-General *v.* Warren, 2 *Swanst.* 302; Attorney-General *v.* Glyn, 12 *Sim.* 84; Penfield *v.* Skinner, 11 *Verm.* 296; Brick Presbyterian Church, 3 *Edw.* 155; Dutch Church *v.* Wroll, 7 *Paige* 77; Alexander *v.* Stevens, 7 *B. Monr.* 351; St. John's Church *v.* Steinmetz, 6 *Harris* 273.

The opinion of the court was delivered by
LOWRIE, C. J.—The principles decided in Kerlin *v.* Campbell, 15 *State R.* 500, and in Griffitts *v.* Cope, 17 *Id.* 99, very clearly require the affirmance of this decree.

In 1745, Casper Wistar, for the consideration of £40, conveyed to Valentine Hergebrood and others, in fee, one hundred acres of land; and shortly afterwards, the grantees executed a declaration of trust, whereby they declared that they did not buy the land for themselves, but by the direction of this congregation, that the deed was made to them so that they and their successors chosen by the congregation should stand seised of the land for the use of the congregation, for the benefit of its poor, for a place to erect a church, and for a burial-ground.

Now, it is very plain, that hereby a complete fee-simple title in legal form passed from Wistar to the trustees, and that an equal title, in the form usually adopted for conveying land to congregations under the Act of 1731, passed from the trustees to the congregation. That act gave to religious societies legal capacity

to hold, and therefore the conveyance to their trustees constituted an executed legal estate in the congregation itself. The use of the medium of trustees was mere matter of form, and does not at all make this a case of a charitable use. Such trustees seldom, if ever, convey to successors; but the title in their name is treated as the title of the congregation, to be used by the congregation at their discretion, for such purposes as the law allows. How merely formal is the medium of trustees, is seen in Chambers *v.* Calhoun, 18 *State R.* 13, where a contract with a congregation to pay "to the building committee" not then named, was allowed to be sued on by the congregation in the names of the building committee afterwards appointed.

· For what purposes could this congregation legitimately hold this land? The Act of 1731 says, for places of worship, burying-grounds, schools, and almshouses. Having, therefore, bought the land, they may hold and use it for these purposes, and they alone are to judge in what proportions they will apply it to each purpose. And the land being entirely their own, they may sell it when and to whom they please. No restraints on its use or alienation, imposed by themselves or others, are of any validity: 19 *State R.* 41, 369; 20 *Id.* 303; 26 *Id.* 231. Within the sphere of their legitimate congregational action, they may change their intentions and vary the application of their resources according to their pleasure.

What then is the efficacy of the declaration that the congregation holds the land for the use of its poor, for a church, and for a burial-ground? Nothing, except to show that they hold it for the purposes for which the law allows congregations to hold land. Not to limit their own title, but to recognise the uses allowed by law. So it is plainly held in Griffitts *v.* Cope, and we need not repeat the argument there presented.

We do not discover anything that prevents one congregation from having two places of worship; and, therefore, they may contract debts for the erection of both, and may pledge their land to pay them. Their new act of incorporation, *P. L.* 1846, p. 98, expressly gives them this power, and it does not violate the title by which they hold their land. The court below imposed some restrictions on the congregation; but these are not here complained of.

Decree affirmed, with costs.

STRONG, J., having been of counsel for one of the parties, did not sit in this cause. READ, J., dissented.