## Veech et al. v. Trustees of Trinity Episcopal Church of Connellsville.

*Ejectment—Adverse possession—Grant — Presumption — Unincorporated religious society.*

1. An unincorporated religious society in Pennsylvania is legally capable of taking title to land by grant, and can acquire title to land by presumptive grant.

2. Inasmuch as an unincorporated religious society in Pennsylvania is legally capable of taking and holding title to land by grant or by a presumption thereof, it necessarily follows that such an organization can acquire title by adverse possession.

3. Where, in rebuttal, in an action of ejectment against an unincorporated church organization, which claims title to the land in dispute by presumptive grant and adverse possession, there is offered in evidence a petition of the trustees filed in the court many years previous to the trial of the ejectment, by the authority of the vestry of the church, at the instance and request of the officers and members thereof, for an order authorizing the trustees to make sale for the payment of debts of another lot of ground which had been purchased by the trustees for the purpose of erecting thereon a rectory or parsonage, in the erection whereof said debts had been incurred by the church, and in which petition it was set forth that the property proposed to be sold "is all the real estate said church has any interest in," which offer is made for the purpose of showing an admission on the part of the church at that time that it did not own the land described in the writ of ejectment, the allegation quoted is not conclusive of the rights of the congregation in the property in controversy in the ejectment, but is properly admissible, and is a matter for the consideration of the jury, in connection with all the other evidence in the case, under proper instructions from the court.

Motion for judgment for defendant *non obstante veredicto* and for a new trial. C. P. Fayette Co., June T., 1915, No. 604.

*Sterling, Higbee & Matthews*, for plaintiffs.

*Playford & Phillips*, for defendant.

VAN SWEARINGEN, P. J., Dec. 21, 1922.—The land described in the præcipe and writ of ejectment consists of a rectangular lot, fronting 75 feet on Ashman Avenue and extending back at right angles thereto a distance of 120 feet to an alley, on which is erected a building known as the Episcopal Church, in what formerly was the Borough of New Haven, now a part of the City of Connellsville.

The land was granted by the Commonwealth of Pennsylvania by patent to Edward Cook, by whom it was conveyed to Isaac Meason, who, by his last will and testament, duly probated Feb. 4, 1818, devised it to his daughter, Mary Rogers, the wife of Daniel Rogers, and the plaintiffs in this proceeding are her heirs-at-law or their grantees. In 1832 the church building was erected on the lot, which, in the same year, was taken possession of and thereafter for many years was occupied by the Congregation of the Trinity Episcopal Church, an unincorporated religious society, which continued to occupy it for the holding therein of services according to the faith, liturgy and doctrine of the Episcopal Church, until about the year 1911 or 1912, when, on account of the bad condition of repair of the building, the congregation abandoned it, at least temporarily, as a place for holding religious services, and thereafter held their services in the Y. M. C. A. building in another part of the city, and at about that time, by authority of the congregation, the control of the church building was taken over, and control thereof afterwards was exercised, by the Board of Trustees of the Diocese of Pittsburgh, a corporation, the helping arm of the Episcopal Church, founded for the purpose of preserving parish property, for the benefit of the Trinity Episcopal Church Congregation. In January, 1913, the church building then

not being used or occupied by anybody, the windows and doors were locked by plaintiffs. On April 26, 1913, the Board of Trustees of the Diocese of Pittsburgh entered into a lease of the building for one year, at a rental of $15 per month, to the Trustees of the Union Baptist Church of Connellsville, a colored congregation, and forcibly, without the knowledge or consent of plaintiffs, removed the locks from the doors for the benefit of the lessees. This started a controversy which resulted in defendant's ruling plaintiffs to bring an action of ejectment for possession of the property, which rule was made absolute by the court, and plaintiffs then instituted this proceeding on May 7, 1915, and the return of the service of the writ by the sheriff showed the defendant to be in possession.

At the trial, plaintiffs offered their paper title and rested. The line of defence was in accordance with the following allegations contained in defendant's answer and abstract of title: "The defendant avers that in 1832 the Congregation of the Trinity Episcopal Church received the title to the land described in the writ, entered into possession of the same, and then and there improved said land by building thereon, in the year 1832, a certain church, known as the Trinity Episcopal Church, and that the defendant and those under whom, through whom, and for whom, the defendant claims, have enjoyed actual, open, notorious, exclusive, hostile and continuous possession thereof, against all and every person or persons whatsoever, and have held since the date of taking said possession, 1832, actual, adverse, visible, notorious, distinct and hostile possession thereof. The defendant denies that the plaintiffs are the owners in fee simple, or have title to, or are entitled to the possession of, said tract of land or any part thereof, and avers that the ownership, right of possession and title to all and every part of said tract of land is vested in the defendant by virtue of a grant, and by adverse possession continuously since 1832. The Board of Trustees of the Diocese of Pittsburgh, defendant, is in possession and holds in trust for the Congregation of the Trinity Episcopal Church." In rebuttal, plaintiffs offered in evidence the record of this court, at No. 231, June Term, 1881, being a petition of the trustees of said church, presented to the court on June 13, 1881, by authority of the vestry of the church, at the instance and request of the officers and members thereof, for an order authorizing the trustees to make sale, for the payment of debts, of another lot of ground which had been purchased by the trustees for the purpose of erecting thereon a rectory or parsonage, in the erection whereof said debts had been incurred by the church, and in which petition it was set forth that the property proposed to be sold "is all the real estate said church has any interest in." This offer was made, as stated by counsel, for the purpose of showing an admission on the part of the church in 1881 that it did not own the land described in the writ. At the close of the trial, the jury returned a verdict for plaintiffs under binding instructions from the court.

There are now two motions of defendant before the court, one for judgment for defendant *non obstante veredicto*, and the other for a new trial. It is not contended that the present defendant received any grant for the premises described in the writ, or that the present defendant has been in possession of the property for a sufficient length of time to acquire title by adverse possession, but that the Congregation of the Trinity Episcopal Church, under the evidence in the case, will be presumed to have taken title by grant to it, and that, in any event, it acquired title by adverse possession. The motions involve the questions (1) whether or not an unincorporated religious society can acquire title by presumptive grant, or (2) by adverse possession, and

3 D. & C.

(3) the effect to be given the petition of the trustees of the church, presented to the court in 1881, wherein it was stated that the property then proposed to be sold was all the real estate in which the church had any interest.

1. In Dougherty *v.* Welshans, 233 Pa. 121, Mr. Justice Elkin cited a list of cases which, he said, will show not only the foundation of the rule of presumptive grant, but the extent and limitation of its application. Those cases show the ground of the rule to be the difficulty of accounting for the possession and enjoyment of the property without presuming a grant or other lawful conveyance. The presumption may be used to supply an absent link in the chain of title. After a great lapse of time and a series of circumstances disclosing the enjoyment of an unchallenged title during such period, the courts will presume whatever grant may be necessary to quiet the title. These presumptions conduce to repose. The rule of presumption, when traced to its foundation, is a rule of convenience and policy, the result of a necessary regard to the peace and security of society. No person ought to be permitted to lie by whilst transactions can be fairly investigated and justly determined until time has involved them in uncertainty and obscurity, and then ask for an inquiry. Witnesses will die, papers will be lost or destroyed, and the exact proof of an ancient transaction thereby often becomes exceedingly difficult, sometimes impossible. The rule of law which authorizes the presumption, therefore, is founded in necessity and should be applied in all proper cases. There is no positive rule defining the time necessary to create a presumption of conveyance, but it is not less than twenty-one years. The presumption depends upon the facts of each particular case, and may be invoked not only against a mere intruder, but also against one claiming under color of title.

Those who have been in possession and enjoyment of the land must be legally capable of taking a grant, or a grant will not be presumed. It has been said that in most jurisdictions the rule is that an unincorporated association cannot in its aggregate capacity take title to lands by grant; that, ordinarily, title must be made to the individuals composing the association, or to an individual and his heirs in trust for its use, or to trustees for its benefit, if that be not obnoxious to the rule against perpetuities; and that the reason for declaring deeds to associations invalid is that they are void for uncertainty: Wrightington on Unincorporated Associations, § 60. In Pennsylvania, it has been held that an action of *assumpsit* cannot be brought against an unincorporated beneficial association, inasmuch as there is no such entity known to the law: Oster *v.* Brotherhood of Locomotive Firemen and Enginemen, 271 Pa. 419; Taylor *v.* Order of Sparta, 254 Pa. 556; Wolf *v.* Limestone Council, 233 Pa. 357. In Maisch *v.* Order of Americus, 223 Pa. 199, the broad statement was made that "there is no such entity known to the law as an unincorporated association;" but that was said where an action of *assumpsit* was brought against an unincorporated beneficial association. And see McNeal *v.* Farmers' Market Co., 43 Pa. Superior Ct. 420. But the law governing unincorporated religious societies in Pennsylvania is different. By the Act of Feb. 6, 1731, 1 Sm. Laws, 192, after confirming grants of land made to trustees for the benefit of religious societies, it was provided in section 3: "That it shall and may be lawful to and for any religious society of Protestants, within this province, to purchase, take and receive, by gift, grant or otherwise, for burying grounds, erecting churches, houses of religious worship, schools and almshouses, for any estate whatever, and to hold the same for the uses aforesaid."

As early as 1817, in Mather *v.* The Ministers of Trinity Church, 3 S. & R. 509, where it appeared in evidence that the plaintiffs and their predecessors

had been long in possession of a church and a small piece of land adjoining it, part of which had been enclosed and used for a burial ground since the year 1727, and the remainder thereof being unenclosed, it was said by Mr. Chief Justice Tilghman: "I fully agree with the President of the Court of Common Pleas that the possession proved by plaintiffs was sufficient to recover in an ejectment, and sufficient for a presumption that the Commonwealth had either granted the land or, at least, a right of pre-emption to the predecessors of the plaintiffs. And supposing it to be only a right of pre-emption, that is a good title against all persons but the Commonwealth. The compliance with the terms of pre-emption is a matter between the Commonwealth and the occupier. A third person has nothing to do with it. There is no absolute time prescribed by law on which to found this kind of a presumption. Circumstances may require in different cases a different length of time. The circumstances of this case are very strong. The land lies in the midst of a very thickly settled country, where it is extremely valuable. The possession has been too notorious to be unknown to the officers of the late proprietaries. No kind of possession can be more notorious than the building of a church and using it for public worship, and the occupation of an adjoining piece of land for a burial ground. The remainder of the land being unenclosed is no objection to the possession of the whole. It is the common usage to leave a piece unenclosed for the free passage of the congregation and the accommodation of horses and carriages. Considering the object, the possession was complete. It was all that the nature of the case required. And the length of time (ninety years) is so great that it is not to be accounted for without supposing a grant, or the promise of a grant, which would establish a right of pre-emption."

That case was cited and quoted from with approval by Mr. Justice Baldwin, of the Supreme Court of the United States, when sitting at circuit at Philadelphia in 1833, in discussing the subject of devises and bequests for pious and charitable uses, and the question of presumptive grants, in Magill v. Brown, published with note to Blenon's Estate, Brightly's Rep. (Pa.), 338, which opinion, "in the judgment of the late United States District Judge John Cadwallader, himself a jurist of extraordinary learning, was the greatest legal opinion ever delivered," wherein "he discussed the question with a degree of industry, learning and research that can scarcely be paralleled in the annals of jurisprudence:" Hampton L. Carson's History of the Supreme Court, vol. 1, page 281. Summing up in a single paragraph what was contained in an opinion covering sixty-four pages, set in six-point type, Mr. Justice Baldwin said: "The view which we feel constrained to take of the Constitutions of 1701, 1776 and 1790, all of which remain in force so far as respects the rights of property, conscience and religious worship, is that all bodies united for religious purposes, though without a written charter or law, are to be considered as corporations by prescription, or the usage and common law of the State, with all the attributes and incidents of such corporations by the principles of the common law, and entitled to all rights which are conformable to the customs of the province. To deny to bodies united without a charter any rights of property which could be enjoyed by a corporate body would be in direct opposition, both to the Constitutions of the State and Union and the custom of the province. Incorporations were almost unknown, yet to all sorts of pious and charitable associations, in every part of the province, valuable bequests were made by those who were ignorant of the niceties of expression necessary to accomplish the object at common law. Nothing was more frequent than bequests to unincorporated congregations, without the

3 D. & C.

intervention of trustees; and even when there was a corporation, it frequently happened that the corporate designation was mistaken or the trust vaguely described. Notwithstanding which, the testator's bounty was uniformly applied to the object. Surely a usage of such early origin and extensive application may claim the sanction of a law resting, as it does, on the basis of all our laws of domestic origin, the legislation of common consent. The same principle is adopted in all governments; usage or custom is presumed to have had its origin in a law once in existence and lost in the lapse of time, the evidence whereof, being by presumption, supplies the place of the written law, which is taken to have been as broad as the usage. We may assume these principles to be settled, that usages and customs have the force of laws, that those which are saved and preserved by the Constitution of this State are its supreme law. When such is the effect of the Constitution, it certainly would not be the law of the State that bodies united or incorporated needed any other protection for their rights, privileges or estates. They could be submitted to no other test than usage. The law of usage, which, being saved by the Constitution, became a supreme law, gave the same right to all societies united or incorporated for these purposes, whether Protestant or not. If, then, the religious societies which have existed in this State had no other foundation for their rights of property than the principles of the common law and long usage, they could not be disturbed for want of an actual incorporation by charter or law; and when we add to these rights those expressly secured to them by the Constitutions of the State and Union, we cannot doubt that they are as inviolable as a charter could make them. To decide that a charter was necessary to enable a religious society to enjoy the sites and buildings for worship, for charity, for education and sepulture, and funds for the maintenance and support of the poor, would be a declaration that the rights of conscience and worship could be made dependent on the discretion of the legislature. And if a charter could be withheld from any society, united for religious purposes, so as to impair their rights of property, then a preference could be given to modes of worship, there would be a virtual prohibition of the free exercise of religion, and the sect favored by the legislature would be, in substance, a religious establishment."

What was referred to by Mr. Justice Baldwin in one place in his opinion as the "Constitution of 1701," and in another place as the "Charter of Privileges of 1701," evidently was what is referred to by Thomas Raeburn White, on page XXI of the Historical Introduction to his Commentaries on the Constitution of Pennsylvania, where it is said in reference to William Penn: "In 1699, Penn again returned to the colony and personally took charge of the Government. Two years later, in 1701, he published a final charter of privileges, as it was called, under which the Government was conducted until the Revolution. Freedom of religion was guaranteed. Many of the provisions in the present Constitution of Pennsylvania, and in those of many other states, can be traced directly to the various constitutions and charters of William Penn. Just after publishing the new frame of government, Penn was again compelled to return to England, and he never afterwards came back to Pennsylvania." In the first article of Penn's Charter of Privileges, originally recorded in the rolls office at Philadelphia, in Patent Book A, vol. II, page 125, and published at page X of the appendix to the bound volume of the Acts of Assembly of the Province of Pennsylvania, is contained the following: "Because no people can be truly happy, though under the greatest enjoyment of civil liberties, if abridged of the freedom of their consciences, as to their religious profession and worship; and Almighty God being the only Lord

of conscience, Father of light and spirits, and the author as well as object of all Divine knowledge, faith and worship, who only doth enlighten the mind, and persuade and convince the understandings of people, I do hereby grant and declare that no person or persons, inhabiting in this province or territories, who shall confess and acknowledge one Almighty God, the creator, upholder and ruler of the world, and profess him or themselves obliged to live quietly under the civil government, shall be in any case molested or prejudiced in his or their person or estate, because of his or their conscientious persuasion or practice, nor be compelled to frequent or maintain any religious worship-place or ministry contrary to his or their mind, or to do or suffer any other act or thing contrary to their religious persuasion." And in the third clause of article eight it is provided: "But because the happiness of mankind depends so much upon the enjoying of liberty of their consciences, as aforesaid, I do hereby solemnly declare, promise and grant, for me, my heirs and assigns, that the first article of this Charter relating to liberty of conscience, and every part and clause therein, according to the true intent and meaning thereof, shall be kept and remain without any alteration, inviolably forever." Section 45 of the Constitution of 1776 contained this provision: "And all religious societies or bodies of men heretofore united or incorporated for the advancement of religion or learning, or for other pious and charitable purposes, shall be encouraged and protected in the enjoyment of the privileges, immunities, and estates which they were accustomed to enjoy, or could of right have enjoyed, under the laws and former Constitution of the State." The Act of 1731, already cited, was a legislative recognition of the status of unincorporated religious societies in the law that already had been given recognition by the custom of the country. In article VII, § 3, of the Constitution of 1790, it was provided: "The rights, privileges, immunities, and estates of religious societies and corporate bodies shall remain as if the Constitution of this State had not been altered or amended;" and exactly the same clause was contained in the corresponding article and section of the Constitution of 1838. And there is nothing in the present Constitution of Pennsylvania, which became effective in 1874, designed to affect the status of unincorporated religious societies thus established and continuously approved by the law and custom of the State. In the first amendment to the Constitution of the United States it is provided: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

After referring to the mode of holding real estate for religious societies by trustees, it was said by Mr. Justice Sergeant in Unangst *v.* Shortz, 5 Wharton, 506: "This mode of holding real estate in trust for religious societies, and others of a charitable nature, was frequently adopted in Pennsylvania when it was a province, instead of a charter of incorporation; and sales and grants of lands for these purposes were ratified and confirmed by act of assembly as early as 1731. The same act gave authority to any religious society of Protestants within the province thereafter to take, receive, and hold the same, for the uses prescribed in the grants. Their privileges and rights are also explicitly reserved and protected by the Constitutions of 1776, 1790 and 1838. They are not incorporated bodies, in the proper sense of the term, but resemble them in this, that their trusts are of a public character, and are specially recognized and provided for by the laws and Constitution of the Commonwealth." See, also, Stevick on Unincorporated Associations, 3 and 4. In speaking of a devise to an unincorporated association for religious purposes, it was said by Mr. Justice Sergeant in Zimmerman *v.* Anders,

3 D. & C.

Veech et al. *v.* Trustees of Trinity Episcopal Church of Connellsville.

6 W. & S. 218: "That such a devise is good, and that a religious society may take and hold a bequest or devise for charitable purposes, has been too solemnly and repeatedly adjudicated to be now called in question. No judge of this State has in any case doubted it, and every decision has sanctioned it." It was said by Mr. Justice Lowrie in Phipps *v.* Jones, 20 Pa. 260: "There ought to be no doubt about the right of unincorporated religious societies to sue on a contract made with them in their associate capacity and for the legitimate purposes of their association, even though there be no person named or described in the contract as trustees or committee-men on behalf of the society. Such associations have always, and especially since the Act of 1731, been recognized as having an associate and quasi-corporate existence in law, with power to hold land and build appropriate houses, and, of course, with power to acquire rights by contract, and to vindicate them," which was cited with approval by Mr. Justice Mitchell in Liederkranz Singing Society *v.* Germania Turn-Verein, 163 Pa. 265. And it was said again by Mr. Justice Lowrie in Brendle *v.* The German Reformed Congregation, 33 Pa. 415: "In 1745, Casper Wistar, for the consideration of fifty pounds, conveyed to Valentine Hergelrood and others, in fee, 100 acres of land, and shortly afterwards the grantees executed a declaration of trust, whereby they declared that they did not buy the land for themselves, but by the direction of this congregation (then unincorporated); that the deed was made to them so that they and their successors chosen by the congregation should stand seised of the land for the use of the congregation, for the benefit of the poor, for a place to erect a church, and for a burial ground. Now, it is very plain that hereby a complete fee simple title in legal form passed from Wistar to the trustees, and that an equal title in the form usually adopted for conveying land to congregations, under the Act of 1731, passed from the trustees to the congregation. That act gave to religious societies legal capacity to hold, and, therefore, the conveyance to their trustees constituted an executed legal estate in the congregation itself. The use of the medium of trustees was mere matter of form. . . . Such trustees seldom, if ever, convey to successors; but the title in their name is treated as the title of the congregation, to be used by the congregation at their discretion, for such purposes as the law allows."

In Krauczunas *v.* Hoban, 221 Pa. 213, where a bill was filed by certain of the members on behalf of an unincorporated religious association to compel its trustees, who had taken title to land purchased by the organization, to convey the land according to its direction, Mr. Justice Stewart said: "The property conveyed was the property of the congregation. While the legal title was in the former trustees, the entire beneficial interest, equivalent in equity to a corresponding legal estate, was in the congregation. The latter's dominion over it extending even to the right of alienation under proper conditions, not qualified by any right in the trustees." After quoting in the above opinion from Brendle *v.* The German Reformed Congregation, 33 Pa. 415, and stating that "a trust so limited is as dry and passive as any that can be conceived, it gives to the trustee neither interest in the estate nor power to control it or direct its management in any way; it creates no duty for the trustee to perform and leaves nothing to his discretion; he is simply the passive, silent depository of the legal title, and nothing more," the court cited the Act of April 26, 1855, § 7, P. L. 328, which provides that "'whensoever any property, real or personal, shall hereafter be bequeathed, devised or conveyed to any ecclesiastical corporation, bishop, ecclesiastic or other person, for the use of any church, congregation or religious society, for religious worship or sepulture, or the maintenance of either, the same shall not be otherwise taken

and held, or inure, than subject to the control and disposition of the lay members of such church, congregation or religious society, or such constituted officers or representatives thereof,' and 'that it shall be lawful for the majority of the male members, of lawful age, of any unincorporated church, congregation or religious society to choose for their trustee or trustees any other person or persons than a layman, and whenever not previously declared, to declare the manner in which the title to their trust control shall be held and conveyed, subject, however, to all terms and conditions upon which the same may have been bequeathed, devised or conveyed to such unincorporated church, congregation or religious society, and upon due proof of such consent, any court having jurisdiction over trusts may direct the legal title to be conveyed accordingly,' " and said: "This legislation in most unequivocal terms confirms to every religious society, incorporated or unincorporated, the absolute ownership of its property, subject only to the condition that it shall not divert it from the uses and purposes and trusts to which it may have been lawfully dedicated. It expresses the settled policy of the State with respect to the tenure of property held by religious societies that has been steadily observed without question for now more than half a century." In Mazaika *v.* Krauczunas, 229 Pa. 47, it was said: "The ownership of the church property is in the congregation, to do with as it pleases, except that it may not divert it from the uses with which it is impressed." And see, also, Mazaika *v.* Krauczunas, 233 Pa. 138; Ryan *v.* Dunzilla, 239 Pa. 486; Novickas *v.* Krauczunas, 240 Pa. 248; Novicky *v.* Krauczunas, 245 Pa. 86; St. Joseph's Lithuanian Roman Catholic Church's Petition, 270 Pa. 73.

In Carrick Borough *v.* Canevin, 243 Pa. 283, which was a *scire facias sur* a municipal claim of assessment for benefits for grading, curbing and paving a road in front of a cemetery lot owned by an unincorporated religious society, the title to the property being held in the name of a trustee, it was held that notice to the trustee by the viewers of the time and place of their meeting to exhibit their schedules of damages and benefits was not sufficient under the Act of May 16, 1891, P. L. 75, because not given to the real owners of the property. In Barrett *v.* King, 64 Pa. Superior Ct. 601, it was stated explicitly: "An unincorporated association may lawfully hold title to either real or personal property," citing Phipps *v.* Jones, 20 Pa. 260, and Liederkranz Singing Society *v.* Germania Turn-Verein, 163 Pa. 265, although the report of the case does not disclose the nature of the unincorporated association there involved.

2. Inasmuch as an unincorporated religious society is legally capable of taking and holding title to land by grant, or by a presumption thereof, it necessarily follows that such an organization may acquire title by adverse possession. This idea is strengthened, if strengthening be needed, by the concluding part of the 2nd section of the Act of Feb. 6, 1731, 1 Sm. Laws, 192, already referred to, where grants to trustees of religious societies were declared "to be for the sole use, benefit and behoof of the said respective societies, who have been in the peaceable possession of the same for the space of twenty-one years next before the 10th day of June, in the year of our Lord one thousand seven hundred and thirty, or for whose use the same were at first given, granted or devised, and no other."

In Hough *v.* Trustees of the Free Methodist Congregation of Smithton, 10 Westmoreland L. J. 80, the late Judge McConnell permitted a verdict for the defendants in an ejectment to stand, although the defendant congregation was an unincorporated religious society, on grounds of both presumptive grant and adverse possession. In his opinion on a rule for judgment for

3 D. & C.

Veech et al. v. Trustees of Trinity Episcopal Church of Connellsville.

plaintiff *non obstante veredicto*, he said, *inter alia*, on the question of adverse possession: "It is the religious society itself that is the owner, whether it be incorporated or not incorporated, and whether there are, or are not, trustees in whom the title to the property and control is made to nominally reside. . . . We overruled a point submitted by the plaintiff, bottomed on the allegation that an .unincorporated religious society could not acquire or defend title through the aid of the statute of limitations. . . . If a religious society, even though unincorporated, is invested with these faculties of acquisition and enjoyment of property above spoken of (by presumptive grant) in their associate capacity, as distinguished from the personal faculties of individuals as individuals, who, for the time being, constitute the *personnel* of the society, why should not a provision for the protection and repose of property rights, as embodied in the statute of limitations, inure to the benefit of such title-holding society as well as to any other holders of title to real property? To this inquiry there is only the answer, that there is, in the books, no example of a precedent for so applying the statute. If the principles of the law of Pennsylvania authorizes such an application, the lack of precedent is of little consequence. . . . There does not seem to be any real difficulty in concluding that an unincorporated religious society is possessed of the faculty of acquiring, or being subject to the liability of losing, title to its real estate, through the statute of limitations, just as individual owners can."

But we are not without Supreme Court authority on the subject. In Trauger v. Sassaman, 14 Pa. 514, which was an action of trespass *quære clausum fregit*, two congregations were in possession of a country church property, which was being encroached upon by defendant. Plaintiffs showed no conveyance of the premises to them, but relied on an exclusive possession for more than twenty-one years. It was said by Mr. Justice Coulter: "The evidence shows, with entire certainty, that the two congregations had been in possession of the grove and vacant space in front of the church, the *locus in quo*, for upwards of seventy years, as a place to put their carriages upon and a place to hitch their horses; a convenience, or easement, or right, whatever it is called, without which the church itself would be useless in a country place. They used it uniformly and exclusively, for there is not a scintilla of testimony that anybody else claimed possession in all that lapse of time, or had any kind of possession or occupancy, or claimed to have it, in opposition to them. This possession on the part of the congregations would have given a right by prescription, in England, even before the late statute on that subject, and in this State there can be no doubt that the congregations acquired a title under the statute of limitations." And in referring to that case it was said by Mr. Justice Sharswood in Tinicum Fishing Co. v. Carter, 61 Pa. 21: "It was there held that the undisturbed and exclusive use by two congregations of a piece of ground adjoining a church, in which they both worshipped, for fastening therein horses and carriages during Divine service for above seventy years will give title thereto by the statute of limitations. 'There is not a scintilla of testimony,' said Mr. Justice Coulter, 'that anybody else claimed possession in all that lapse of time, or had any kind of possession or occupancy, or claimed to have it, in opposition to them.' That, then, was not the case of a mere easement, but an interest in land." And see Bose v. Crist, 193 Pa. 13; Congregation Shaarai Shomayim v. Moss, 22 Pa. Superior Ct. 356.

Decisions from jurisdictions outside of Pennsylvania on the question of either presumptive grant or adverse possession are of but little value in this case. Some of them were rendered under controlling statutes, and others not. Many of them do not have back of them the historic features, and the uses

and customs, that directed the trend of legislation and decision in Pennsylvania, and they are not at all harmonious. We have discovered no case in Pennsylvania in hostility to those herein cited. A plain and settled policy has been established by the courts here from which we are not at liberty to depart.

3. We are of opinion that the petition of the trustees of the church, presented to this court in 1881, containing the statement that the property then proposed to be sold was all the real estate in which the church had any interest, is not conclusive as to the rights of the congregation in the property now in controversy, but was properly admissible, and was a matter for the consideration of the jury, in connection with all the other evidence in the case, under proper instructions from the court.

In Cannon *v.* Jackson, 252 Pa. 257, it was said by Mr. Justice Frazer: "In 1896, plaintiff, in a deposition taken on behalf of Mrs. Black for use in presenting the latter's claim to property in England, stated that Mrs. Black was the sole surviving member of the Jackson family, and that there were two properties, the one in dispute and a certain other property belonging to the estate, to which Mrs. Black had title. In explanation, plaintiff refers to the request of her mother not to mention their relationship unless Mrs. Black tried to take away from her any of her rights. The desire to conceal the fact of her illegitimate birth was a natural one. Plaintiff further states Mrs. Black promised to provide well for her in her will, and she, therefore, believed, when Mrs. Black died, she would receive the property she was entitled to. It appears Mrs. Black was in the habit of abusing plaintiff and treated her as a servant, and in the present case plaintiff testified that in the depositions offered in evidence she said just what Mrs. Black told her to say. All these matters have a bearing on the question whether plaintiff's failure to act sooner was an acquiescence in defendant's possession of the property under claim of ownership. In view of the relation between plaintiff and Mrs. Black, the effect of plaintiff's admissions in the depositions is for the jury and cannot be construed to estop her from setting up her claim of title in this action."

In Com. *v.* Monongahela Bridge Co., 216 Pa. 108, it was said by Mr. Justice Potter: "The contention is also made that the bridge company is estopped from alleging its corporate existence by reason of its answer made to the Commonwealth in the suit for taxes. That suit was against this defendant, but it was upon a different cause of action. The allegations in that case may, therefore, be admissible as evidence for whatever they are worth, but they are not conclusive. 'The moment we leave the sphere of the same cause, we leave behind all question of judicial admissions. A judicial admission is a waiver of proof; and a pleading is for the purpose of the very cause itself; a defining of the lines of controversy and a waiver of proof of all matters outside these lines of dispute. But this effect ceases with that litigation itself; and when we arrive at other litigation and seek to resort to the parties' statements as embodied in the pleadings of prior litigations, we resort to them merely as quasi-admissions; that is, ordinary statements, which now appear to tell against the party who then made them:' 2 Wigmore on Evidence, § 1065. The record is received, 'not as an adjudication conclusively establishing the fact, but as the declaration or admission of the party himself that the fact is so:' Truby *v.* Seybert, 12 Pa. 101 (103)."

In Philadelphia Trust Co., Executor, *v.* Philadelphia & Erie R. R. Co., 160 Pa. 590, it was held, as stated in the syllabus: "Inferences of fact are derived wholly and directly from the circumstances of the particular case, by means of the common experience of mankind without the aid or control of any rules of law whatever, and such inferences are to be drawn by the jury and not by

3 D. & C.

the court." It is stated in a paragraph of the syllabus in Hess *v.* Vinton Colliery Co., 255 Pa. 78: "Evidence of what a witness swore to in a former proceeding, even though between different parties, is always admissible to contradict his present testimony and impeach his credibility. In such case, his prior testimony is not considered as conclusively establishing the fact, but as the declaration or admission of the witness that it is so." In the course of the opinion it was said by Mr. Justice Potter, quoting from Truby *v.* Seybert, 12 Pa. 101, citing Greenleaf on Evidence: "A record is admissible against one of the parties as containing a solemn admission or judicial declaration by such party in regard to any particular fact. But in these instances it is received, not as an adjudication conclusively establishing the fact, but as the declaration or admission of the party himself that the fact is so." In Floyd *v.* Kulp Lumber Co., 222 Pa. 257, Mr. Justice Stewart, quoting from 11 Ency. of Plead. and Prac., 80, said: "Where a writing is not a dispositive instrument, but is put in evidence merely to show an extrinsic fact, it will be for the jury to say what inference is to be drawn therefrom. When documents are offered in evidence as the foundation of an inference of fact, whether such inference can be drawn from them is a question for the jury." In Mason *v.* Ammon, 117 Pa. 127, it was said by Mr. Chief Justice Gordon: "The receipt, however, taken in connection with the other parol evidence, does, undoubtedly, not only tend to rebut the *prima facie* presumption of Ralph's occupancy as a tenant in common, but presents a strong case of adverse possession. Still, strong as the evidence is, it ought to have been submitted to the jury."

And now, Dec. 21, 1922, for the reasons stated in the opinion herewith filed, the motion for judgment for defendant *non obstante veredicto* is overruled and dismissed, but the motion for a new trial is sustained, a new trial is granted, and it is ordered that the case be placed again upon the issue docket.

From Luke H. Frasher, Uniontown, Pa.