St. Michael and Archangel Russian Orthodox Greek Catholic Church et al., Appellants, *v.* Uhniat et al., Appellants.

Argued January 16, 1973. Before JONES, C. J., EA-GEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDER-INO, JJ.

*Paul Matzko,* with him *Erskine, Wolfson, Matzko & Pierson,* for plaintiffs.

*John S. Manos,* for defendants.

OPINION BY MR. JUSTICE EAGEN, March 16, 1973:

These appeals are from decrees of the Court of Common Pleas of Philadelphia and constitute the second round of litigation between the parties. Presently at issue is the ownership of certain property claimed by each side.

Litigation between rival factions of the congregation of St. Michael and Archangel Russian Orthodox Greek Catholic Church in Philadelphia, a Pennsylvania non-profit corporation [St. Michael's] began a decade ago. In 1968 an appeal reached this Court wherein the question raised was whether the church was subject to the patriarchal jurisdiction of the Moscow-based general Russian Orthodox Church [Patriarchate], or whether its hierarchical allegiance properly lay with "The Russian Orthodox Church of America", known as the "Metropolia". At the time of our decision [*St. Michael and Archangel Russian Orthodox Greek Catholic Church v. Uhniat*, 436 Pa. 222, 223, 259 A. 2d 862 (1969)], we said, "[u]pon the determination of the proper jurisdiction hinges certain property rights."

Reversing the decree of the Court of Common Pleas, we held that St. Michael's was subject to the control of the Patriarchate. The impact of such a determination on the property aspects of the case was adumbrated at pp. 237-38:

"Here . . . we are confronted with a dispute over church property originally dedicated to the Russian Orthodox Church. . . . St. Michael's property cannot be transferred simply because a majority of its parishioners so desire. If that were permitted, then no real protection would be afforded to hierarchical religious systems. It seems to us that a logical reading of the relevant decisions of the United States Supreme Court produces the conclusion that the constitutional protection of hierarchical organizations precludes not only legislative and judicial action which would destroy church government, but also action by church members themselves which effects a transfer of church property from the control of one hierarchy into the hands of a competing hierarchy. . . .

. . .

"... The lower court has shown no authority for its conclusion that a dedication of a local congregation to a hierarchical general church organization is binding on the local church only until some other hierarchy, administratively and judicially independent of the first but embracing the same religious faith and precepts, comes along."

Following remand by this Court, the Court of Common Pleas entered a final decree on February 16, 1970, pertinently providing that St. Michael's was subject to the hierarchical jurisdiction of the Patriarchate and that all property of the church "shall continue to be the property of said corporation."[1]

Curiously, the Metropolia group appealed this final decree. [Appeal No. 449 January Term, 1970, presently consolidated.] The appeal is utterly devoid of merit. The decree in question simply recites that St. Michael's is a Patriarchal Church and, as such, the corporation is entitled to all of its property [without any specification of what that property was]. As framed, the court's directive is unerringly faithful to our opinion of November 11, 1969, and any appeal therefrom is frivolous.

On March 1, 1970, the Metropolia pastor, Rev. Federonko, turned over the keys to the church building, as well as a number of religious articles, to a designated Patriarchal priest. On May 6, 1970, the Patriarchal group filed a petition and rule to show cause why Rev. Fedoronko should not turn over possession of a certain building located at Veree Road and Shady Lane, Philadelphia [used as a rectory by the Metropolia faction], as well as certain other religious items, church funds and records.

After conducting extensive hearings, the chancellor filed a petition in this Court on June 23, 1970, request-

---

[1] On February 27, 1970, the court filed a memorandum and order which decreed that the directives of the Patriarchate be adhered to by the parties to this litigation.

ing permission to appoint a master and auditor to assist in resolving the claims asserted by both sides with respect to the rectory and funds. Permission was subsequently granted.

The master and auditor examined the appropriate books and records, conducted informal hearings with the parties and submitted a report on February 18, 1972, to which both sides filed exceptions.[2]

---

[2] The principal assets identified by the master and auditor and set forth below consisted in major part of real estate and funds on deposit.

Real Estate:

(a) St. Michael's Church and Sunday School Building, 335-341 Fairmount Avenue, Philadelphia. The Metropolia group surrendered possession of this real estate on March 1, 1970, to a priest appointed by the Patriarchy. Hence, it is no longer contested in any way.

(b) Premises at 5238 Rorer Street, Philadelphia, a single-family dwelling, formerly used as residence for choir director or assistant pastor. This property along with certain of its contents was sold November 11, 1967, for $10,221.28 which was deposited in the General Fund Checking Account.

(c) Premises at 5416 Rising Sun Avenue, Philadelphia, former chapel and pastor's residence. Sold August 13, 1969, along with certain personal property contained therein for $89,317.64.

(d) Premises at Veree Road and Shady Lane, Philadelphia, found by the lower court to have been build with funds from a "New Building Fund" started in 1968 by Metropolia parishioners.

*Personalty*:

(e) The "Old Building Fund" collected from parish members from 1957 to 1962, amounting to $154,765.16 at the time of suit. This fund is presently subject to a final decree entered by the late Judge Charles A. WATERS in the case of *Karnick v. St. Michael's Church*, Court of Common Pleas No. 2, Philadelphia County, March Term, 1965, No. 4513, in Equity. In 1965 certain parishioners affiliated with the Patriarchal group began a class action with the object of obtaining a declaration that the purpose for which the funds were collected [to erect an education and recreation building] had failed and therefore the funds should be returned to the donors in proportion to their contributions. After trial of the issues, the chancellor entered the following decree: "AND NOW,

On June 16, 1972, an adjudication and decree was entered by the chancellor which determined an accounting and division of property in controversy.

The chancellor ordered that the corporation was entitled to reimbursement for the sale of the two pieces of property [5238 Rorer Street and 5416 Rising Sun Avenue, see footnote 2], a total of $99,539.02.

Against this amount certain "credits" were allowed in favor of the Metropolia parishioners. These included $60,298.43 [a savings certificate which tracing revealed represented a part of the proceeds from the sale of the Rising Sun Avenue property]; $336.05 [the amount of increase in the General Fund Checking Account balance of May 12, 1970, over its balance of February 1, 1963]; and $358 [a savings account opened in 1969 in the corporate name]; all of which items were ordered turned over to the corporation. This faction also received a credit of $2953.36 which represented one-half

---

to wit, this 11th day of April, 1967, plaintiffs' prayer for an accounting and for the return of funds contributed by them and other members of this corporation towards the erection of an education and recreation building is dismissed. Defendants and each of them are ordered and directed to hold the said funds, and the interest accruing thereon in trust for the purpose of the erection of an education and recreation building and to refrain from diverting said funds to any different purpose without the vote of a majority of the members of the corporation and the specific consent of the plaintiffs and other individual donors." *The decree was never appealed*, nor in any way consolidated with the present case.

(f) General Fund Savings Account No. 02-205625, $358 plus interest.

(g) General Fund Checking Account—At the commencement of litigation on February 1, 1963, there was a balance in this account of $9,392.85, whereas the new balance when the account was turned over to the corporation on May 12, 1970, was $9,728.90 a net increase of $336.05.

(h) General Fund Savings certificate in the amount of $60,-298.43.

(1) "New Building Fund" checking account, $683.59.

of the amount expended [$5906.73] between 1963 and 1970 on permanent improvements to the church. It had earlier been found that during this time period the Metropolia parishioners were the sole support of the church. Such credits totaled $63,945.84, leaving a balance due of $35,593.18, payable within one year at 6% interest.

The court gave no credit for the $75,716.77 expended by the Metropolia group for church operating expenses during the years of litigation saying, "defendants could not be expected to financially support the church during the said period when nearly all of them were either expelled, excommunicated or excluded from the church by actions taken by the Metropolia hierarchy."

The land and improvements at Veree Road were held to be the property of the Metropolia parishioners. It was found that this property was paid for by Metropolia adherents from the proceeds of the "New Building Fund", a fund specially created late in this litigation for the purpose of erecting a Metropolia structure and which was separately recorded and deposited.[3]

Cross-appeals were immediately filed by the parties.

Appellants in No. 463 [the Metropolia group] assert that error was committed in awarding them only a minimal credit for permanent improvements to the church and nothing for operating expenses. They also urge that the "Old Building Fund" presently subject to an outstanding court order, be consolidated and assigned to the lower court for appropriate action.

Appellants in No. 456 [Patriarchal group] contend the lower court's adjudication violates our 1969 decision, as well as the Lay Control of Church Property

---

[3] In his opinion the chancellor noted that while in 1969 this fund stood at over $100,000, $27,000 had been transferred from the General Fund Checking Account of the corporation and accordingly a credit for that amount was granted to the Patriarchal group.

Act, Act of June 20, 1935, P. L. 353, 10 P.S. §81 and the First and Fourteenth Amendments of the United States Constitution by awarding the dissentient parishioners any property at all.

There are excellent policy reasons why courts should not be quick to eschew decision in religious property disputes. "The state has a legitimate interest in keeping title and ownership in land settled and secure. This 'housekeeping' interest requires that the state know at all times the owners of property within its borders, so that injured persons may find responsible owners, and so that property may be freely alienable. The state also has an interest in affording to disputants some recourse other than the sword for settling their arguments, and the state alone has the authority to make and enforce judgments between such disputants." Note, Judicial Intervention in Church Property Disputes— Some Constitutional Considerations, 74 Yale L. J. 1113, 1130 (1965).

However, in determining the justiciability of this controversy the relevant inquiry must be whether the property dispute can be resolved on the basis of neutral principles of law which do not involve the resolution by the court of ecclesiastical issues. As the United States Supreme Court recently instructed in *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449, 89 S. Ct. 601, 606 (1969) : "The First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. *And there are neutral principles of law, developed for use in all property disputes,* which can be applied with-

out 'establishing' churches to which property is awarded." [Emphasis supplied.]

Turning first to the contested real estate, the Patriarchal group claims a possessory right to the Veree Road property on the grounds that it was purchased with corporate funds in the name of St. Michael's which was ultimately determined to be a Patriarchal Church. The conclusion drawn is that the lower court's decision has the effect of permitting a diversion of property from one hierarchy to another in violation of statutory and case law.

The contention is met by the rejoinder that at the time of purchase, by decree of the lower court, St. Michael's was de facto and de jure affiliated with the Metropolia; that by special segregation only Metropolia money was used to buy the land and build the structure; and, that the property was never dedicated to the Patriarchy and, hence, is not now being diverted.

The proper focus in which to view these rival contentions can best be obtained by recalling certain important facts. During litigation in the lower court and until 1967, both groups, Metropolia and Patriarchal, shared the use of St. Michael's Church, albeit, scheduled at different times. In 1967 the lower court allowed the majority faction to change the church charter to align it with the Metropolia Hierarchy. At this point the Patriarchal group rented a hall from a fraternal organization in which to hold their religious services. While the appeal was pending the Metropolia group in June 1968 started a "New Building Fund" program. Pledge cards for a three-year period entitled "St. Michael's Orthodox Catholic Church of the Metropolia New Building Fund Program" were distributed to the parishioners. Printed on these cards was the following provision: *"It is understood that these funds will be only used for Metropolia Affiliated St. Michael's Orthodox Catholic Church of Philadelphia."* It was found

that approximately $73,000 was raised for the project during 1968-69.[4]

The property in question was purchased in October 1968. The granting clause of the deed identifies the grantee as "St. Michael and Archangel Russian Orthodox Greek Catholic Church in the City of Philadelphia, a Pennsylvania Non-Profit Corporation, whose present Metropolitan is Archbishop Iriney of New York." The body of the deed states the following: "The land herein described is being purchased and is being conveyed for the erection of a Church and Educational and Recreational facilities within the jurisdiction of the Metropolia and kept and maintained by the members of St. Michael's Orthodox Catholic Church who adhere to the hierarchal principles of St. Michael's Orthodox Catholic Church as a Parish under the hierarchy of the Russian Orthodox Greek Catholic Church of America, The Metropolia, as described in various Decrees, Orders and Adjudications in certain litigation in Common Pleas Courts of Philadelphia County, particularly under Common Pleas Court No. 3, December Term 1962, No. 3343 and described in the By-Laws and Charter as approved by Metropolitan Iriney on May 29, 1967; . . ." A rectory was constructed on the site during the fall of 1969.

Perhaps because they correctly sensed that the "formal title" doctrine[5] would be the cornerstone in adjudicating this particular controversy, the Patriarchal group strenuously urges that in reading the deed we look to see who the grantee is by looking solely at the granting clause and then only in the following fashion, "St. Michael and Archangel Russian Orthodox Greek Catholic Church in the City of Philadelphia, a Penn-

---

[4] The land was purchased for $41,500. The rectory was constructed in 1969 at a cost of $35,800.

[5] Under the "formal title" approach whoever holds title to the property has the right to determine the use of the property. See 74 Yale L. J., supra, at 1130 et seq.

sylvania Non-Profit Corporation." All other language concerning the Metropolitan and what the land was to be used for is argued to be mere surplusage.

In our view this represents too crabbed an approach. A deed is to be interpreted in light of the conditions existing when it was executed and the entirety of the language is to be considered. See generally, *Highland v. Commonwealth,* 400 Pa. 261, 161. A. 2d 390 (1960). While it is true that a deed must specify the grantee with sufficient certainty so as to identify him from the rest of the world, the description need not be contained in any particular clause. 12 P.L.E., Deeds, §4, See also 23 Am. Jur. 2d, Deeds, §198: "It is sometimes necessary to resort to the rules of construction to determine the grantee or grantees in a deed. The primary rule of construction that the intention of the parties is to be ascertained may be applied to support the designation of one as grantee whose identity is made certain by the instrument as a whole, even though he is not specifically named or is inaccurately described therein."

With the parties deeply embroiled in litigation at the time of the sale, the church name alone was at that point an ambiguous term. To understand who the grantee was can only be gleaned from a reading of the entire deed. When this is done, it can be seen that the intention of the parties was that the Metropolia faction be grantee.

Since the grantee was not the corporation but merely a faction of what formerly was a unified congregation, inquiry must be made into the status of such a group. Although they had usurped control of the Church, it seems to us they were no more than an unincorporated religious society adhering to the Metropolia. Whether such a group is capable of taking title was answered affirmatively by this Court in *Phipps v. Jones,* 20 Pa. 260 (1853). There the question raised

concerned the right of an unincorporated religious society to institute suit. Writing for the Court, Mr. Justice LOWRIE said at p. 263: "There ought to be no doubt about the right of unincorporated religious societies to sue on a contract made with them in their associate capacity and for the legitimate purposes of their association, even though there be no persons named or described in the contract as trustees or committee-men on behalf of the society. *Such associations have always, and especially since the Act of 1731, been recognized as having an associate and quasi-corporate existence in law, with the power to hold land and build appropriate houses,* and of course with power to acquire rights by contract, and to vindicate them." [Emphasis supplied.] And in *Chester Housing Authority v. Ritter,* 344 Pa. 653, 656, 25 A. 2d 72 (1942), it was said, "There can be no doubt whatever that the unincorporated congregation was competent to contract to buy the land and to build the church; the Act of February 6, 1731, 1 Sm. L. 192, section 2, 10 P.S. §121, authorized it."[6]

---

[6] The Act of 1731 was a five part act relating to religious societies. Section 1 was a recital and section 2 related to a confirmation of grants [later codified as 10 P.S. §121].

Section 3, which bears on this case, originally provided: "And be it further enacted, That it shall and may be lawful to and for any religious society of Protestants, within this province, to purchase, take and receive, by gift, grant, or otherwise, for burying grounds, erecting churches, houses of religious worship, schools and almshouses, for any estate whatsoever, and to hold the same for the uses aforesaid, of the lord of the fee, by the accustomed rents."

This section was altered slightly and codified in 10 P.S. §21, which empowered all religious societies to hold real estate.

Sections 3 and 4 of the Act of February 6, 1731 [1 Sm. L. 192] were repealed insofar as they relate to corporations not for profit by the Act of January 18, 1966, P. L. (1965) 1406, §26, 15 P.S. §8103(b)(1). 10 P.S. §21 was also repealed insofar as it relates to corporations not for profit by 15 P.S. §8103(b)(2).

With respect to the manner in which this land was purchased, the motives of the Metropolia group were transparent. It was in part a hedge against a possible determination that they were not lawfully in control of St. Michael's. We are steadfast in our belief that they could not divert St. Michael's property into their own enterprise, but unless we are to impinge on their freedom of exercise of religion, we cannot say they were not entitled to establish the nucleus of their own church. Accordingly, we affirm that part of the chancellor's decree granting these parishioners leave of court "to place the title to said property in their corporate name or in such other name as they shall decide in accordance with their religious affiliation."

On the other hand we believe the chancellor erred in giving the Metropolia group a credit of $2953.36 for major improvements made to the church during the time it was under their absolute control. He had earlier disallowed any credit for the $75,716 contributed to operating expenses saying, "the defendants could not be expected to financially support the church during the said period when nearly all of them were either expelled, excommunicated or excluded from the church by actions taken by the Metropolia hierarchy." The same reasoning, in our judgment, applies to these improvements. The Metropolia group treated St. Michael's as if it were their own church when in fact it was not so aligned; it is therefore not unfair to assign the risk of losing this investment to them. Likewise, we disallow the credits of $336.05, representing the increase in the General Fund Checking Account balance of May 12, 1970, over its prior balance of February 1, 1963, and

---

The partial repealer is without instant significance since what we are here confronted with is an unincorporated religious association, while the repealer language applies to *corporations* not for profit.

the $358 savings account. Inquiry ends with the fact that they were both established as corporate accounts. The other credit of $60,298.43 stands since it represents real estate sales proceeds which must be returned to the corporation. It is not really a credit in the sense in which the term was previously used; here it is merely an accounting technique. Hence, where it was found that the Metropolia group owed an additional $35,593.-18 to the corporation, we hold it should be increased to $39,240.59.

Error was also committed in ordering the "Old Building Fund" bank books and certificates of deposit to be kept in the joint custody of the treasurers of both groups.

From a reading of Judge WATERS' findings and decree and from the instant record, it seems the status of the "Old Building Fund" as corporate property should be beyond question, despite the fact that both sides contributed to it. As the instant court below noted in its opinion, contributions to this fund were made from 1957 to 1962. As the chancellor observed further on: "It is clear from this record that the contributions to the church prior to the date of this litigation, February 1, 1963, were made by its members without a deep concern for the jurisdictional affiliation of the church for the common good of all members of the church and to support the life of the church." This being the case, any money contributed to St. Michael's Church during the halcyon days of unconcern about jurisdiction properly belongs to the corporation.

Since Judge WATERS' decree was not appealed, it is final and conclusive of the matter and cannot now be modified. His finding was that the purpose of the fund had not failed and therefore *the corporation* should hold the funds in trust for the purposes for which they were originally contributed.

The chancellor's direction of joint custody of the certificates of deposit modifies the above decree. The corporation *alone* should have the custody of these corporate funds.

The decree of the lower court is modified as hereinbefore noted; in all other respects it is affirmed.

Each side to pay own costs.

Mr. Justice ROBERTS and Mr. Justice MANDERINO concur in the result.