619 So.2d 1305 (1993)
James Harold VINES
v.
McKENZIE METHANE CORPORATION, et al.
J. Morris TRAYWICK and Ruth Traywick
v.
McKENZIE METHANE CORPORATION.
1911093, 1911488.
Supreme Court of Alabama.
February 19, 1993.
Rehearing Denied April 9, 1993.
*1306 William J. McDaniel and Edward E. Angwin of McDaniel, Hall, Conerly & Lusk, P.C. and Mac Parsons, Birmingham, for appellant James Harold Vines.
Alton B. Parker, Jr. and Pamela F. Colbert of Spain, Gillon, Grooms, Blan & Nettles, Birmingham, for appellants J. Morris Traywick and Ruth Traywick.
Isaac P. Espy of Espy, Nettles and Scogin, P.C., Tuscaloosa, for appellee McKenzie Methane Corp.
Conrad P. Armbrecht, Edward A. Dean and Duane A. Graham of Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, Mobile, for amicus curiae Jim Walter Resources, Inc.
Victor T. Hudson and William W. Watts III of Reams, Philips, Brooks, Schell, Gaston & Hudson, P.C., Mobile, for amicus curiae NCNB Tex. Nat. Bank.
PER CURIAM.
This opinion addresses two appeals, which present the same issue of first impression.
James Harold Vines sued McKenzie Methane Corporation ("McKenzie Methane") and Daniel Clark, land manager for McKenzie Methane, alleging that the company had wrongfully extracted coalbed methane gas from beneath land that he owned in Shelby County. McKenzie Methane counterclaimed, arguing that it holds a leasehold interest for the coalbed methane gas via a lease executed in 1902 between the landowners and the previous mineral owner, USX Corporation. Through subsequent assignments, McKenzie now has this leasehold interest in "all of the coal, iron ore, and other minerals, in, under, and upon" Vines's property. The trial court held that McKenzie Methane's estate in coal included the right to drill for coalbed methane, and it entered a summary judgment for the company. Vines appeals.
While Vines's suit was pending, McKenzie Methane brought a declaratory judgment action against J. Morris Traywick and Ruth Traywick, asking the court to declare that the company was entitled to extract coalbed methane gas from a parcel of land owned by the Traywicks. The land is subject to an 1898 mineral lease held by Southern Electric Company, which grants a leasehold interest in "all the coal and other minerals, in, under, or upon" the land and also grants an easement for the "conveying and transporting to and from any of said lands all material or implements that may be of use in the mining and removal of said coal and other minerals, or in the preparation for market." In 1989, Southern Electric leased its mineral rights to McKenzie Methane "for the purposes of investigating, exploring and prospecting for coalbed methane gas." The court entered a summary judgment for McKenzie Methane, holding that the 1898 lease of "coal and other minerals" entitled McKenzie Methane to drill for coalbed methane gas as the assignee of this lease. The Traywicks appeal.
We begin by noting the evidence in the record concerning the nature of coalbed methane gas. Coalbed methane gas is produced from coal seams, formed during and as a by-product of the coalification process. Murray, "Coalbed Methane: A Significant New Source of Clean Energy for the 21st Century," IV Interstate Oil & Gas Compact Comm. Bull., 67 (1990). Coal is a reservoir for the gas, like any other stratum containing natural gas reserves. While some of the gas generated during the coal-forming process migrates out of the coal, a large amount is retained within the coal itself; that is, the gas is physically *1307 bound to and absorbed into the coal. Murray. As the coal is mined, the draining of water out of the cracks of the coal and the stresses placed on the coal cause increasing quantities of the methane to become free from the coal and to accumulate in the mining area. Murray. Because the gas is toxic and highly explosive, its release from the coal causes a significant hazard to the miners, as well as to the mining machinery and the mining process itself. Olsen, "Coalbed Methane: Legal Considerations Affecting Its Development as an Energy Resource," 13 Tulsa L.J. 377 (1978). Because of this hazard, the mine operator is required by federal and state law to monitor and control the rate of methane seepage from the coal during the mining process. 30 U.S.C. § 863; § 25-9-82(b), Ala. Code 1975. While mining operators use ventilation fans to remove most of the methane from the coal, they also drill "vertical" and "horizontal" wells to remove the methane gas that is released prior to the intensive mining procedures and drill "gob" wells to remove the gas that is released immediately after active mining. Bowles, "Coalbed gas: Present Status of Ownership Issue and Other Legal Considerations," 1 Eastern Mineral Law Institute, 7-1 (1980). The existence of coalbed methane in commercial quantities was recognized in Alabama as early as the 1920's; however, coalbed methane did not support a significant industry until the 1980's, when technological developments and changes in federal law made the gas a commercially viable alternative energy source.
The dispositive issue in these appeals is whether the mineral leases in question conveying interests in coal also gave McKenzie Methane the right to drill for coalbed methane gas. The meaning of the term "minerals" as that word is used in any particular grant or reservation is not to be determined by rigid and arbitrary definitions, but from the language of the grant or reservation, the surrounding circumstances, and the intention of the grantor, if it can be ascertained. Exxon Corp. v. Waite, 564 So.2d 941 (Ala.1990). When the leases in question in these appeals were drafted, coalbed methane gas had little or no commercial value and was not removed from the earth for the sake of its own value. Vines and the Traywicks thus conclude that the lessors of interests in the coal and other minerals could not have intended to give the lessees the right to drill for coalbed methane.
Because drilling coalbed methane gas has only recently become a profitable business, there are few cases addressing the issue of whether that gas is necessarily included within the lease of an interest in coal. The first case to address the issue was United States Steel Corp. v. Hoge, 503 Pa. 140, 468 A.2d 1380 (1983). United States Steel Corporation owned "all of the coal" contained in certain tracts of land owned by the individual defendant, Hoge, as well as "all the rights and privileges necessary and useful in the mining and removing of said coal, including ... the right of ventilation." 503 Pa. at 144, 468 A.2d at 1382. Hoge retained the "right to drill and operate through said coal for oil and gas without being held liable for any damages." Id. After considering the nature of methane gas, the Pennsylvania Supreme Court held that the gas as it is present in coal intrinsically belongs to the owner of the coalbed, so long as it remains part of the coalbed, and that ownership would be lost only upon a grant of rights or when the gas left the coalbed through the process of migration. In determining that coalbed methane gas was included in the grant of rights contained in the 1920 deed, the court ascertained the intent of the parties according to the following rationale:
"[A]t the time this coal severance deed was entered into, although commercial exploitation of coalbed gas was known such operations were very limited and sporadic. Indeed for the most part coalbed gas was a dangerous waste product which had to be vented from the coal seam to allow for safe mining of the coal....
"The reservation to the grantor of the right to drill through the coal seam deeded away for oil and gas is stated generally. *1308 Although the unrestricted term `gas' was used in the reservation clause, in light of the conditions existing at the time of its execution we find it inconceivable that the parties intended a reservation of all types of gas. In so finding, we are unable to overlook a basic question: Why would a party retain the right to something which is only a waste product with well-known dangerous propensities?... It strains credulity to think that the grantor intended to reserve the right to extract a valueless waste product with the attendant potential responsibility for damages resulting from its dangerous nature."
By this rationale, the court determined that "subterranean gas is owned by whoever has title to the property in which the gas is resting" and that the title holder "may mine his coal, extract the gas from it, or both." Hoge, 503 Pa. at 147, 468 A.2d at 1384.
In Rayburn v. USX Corp., No. 85-G-2261-W, July 28, 1987, (N.D.Ala.), affirmed, 844 F.2d 796 (11th Cir.1988), the district court for the Northern District of Alabama held that a 1960 deed conveying "minerals and mining rights," but reserving oil and gas rights, did not reserve the right to coalbed methane. The court noted that, at the time of the conveyance, there was no record of extracting coalbed methane gas for commercial profit and no indication that such an industry would arise. The court concluded that the parties could not have considered the coalbed methane to be a gas that was severable from the coal and, thus, a part of the reserved oil and gas estate.
In Carbon County v. Baird, (Ms. No. DV-90-120, Dec. 14, 1992, Thirteenth Judicial District Court, Carbon County, Montana), Carbon County in 1974 had conveyed to Red-Lodge Bear-Creek Partners "all coal and coal rights [in a certain parcel of land] with the right of ingress and egress to mine and remove the same." Those rights were later transferred to Union Reserve Coal Company. Then, in 1991, Carbon County gave Florentine Exploration and Production Company an oil and gas lease purporting to grant "the exclusive right for purpose of mining, exploring by geophysical or other methods, and operating for and producing therefrom oil and all gas, including coal seam methane of whatsoever nature or kind." In determining that the conveyance of coalbed methane to Florentine was invalid, the court recognized that coal seam methane is part of the coal itself and that it is required by law to be drained from the coalbed. Because the commercial drilling for the gas required Florentine to invade the coal itself, the court held that it interfered with Union Reserve's coal mining operation:
"[I]t is important for the entity drilling coal seam methane gas wells to have sufficient control over the mining of coal to prevent the well from being rendered useless, prior to the reservoir being drained of the recoverable coal seam methane gas; further, it is important for the coal mine operator to be able to mine the coal in the most economical and effective method and it is therefore necessary that he have control over the drilling of wells into the coal seam in order to minimize the disruption to the mining process caused by drilling and completion of wells in the coal bed."
The court concluded that a grantor could not sever the right to drill methane gas from the right to mine for coal.
The evidence in the two cases now before us confirms that the processes of drilling for coalbed methane gas and mining for coal are inextricably intertwined. Although the methods of drilling commercially for coalbed methane are somewhat different from those methods used to merely drain the gas and counteract its danger, the process of drilling for the substancefor whatever reasonintrudes upon the process of mining for coal. As early as 1888, this Court held that one who is granted the exclusive right to mine coal upon a tract of land has the right of possession so far as is reasonably necessary to carry on his mining operations. Williams v. Gibson, 84 Ala. 228, 4 So. 350 (1888). "To construe away this right would be to construe away the grant itself, which cannot be enjoyed without it." Williams, *1309 84 Ala. at 232, 4 So. at 353. In recognizing this, however, we are not inclined to hold that a grantor may never grant separate estates in coal and coalbed methane gas. Rather, in keeping with earlier Alabama law construing mineral leases, we hold that an express grant of "all coal" necessarily implies the grant of coalbed methane gas, unless the language of the grant itself prevents this construction. See generally Carter Oil Co. v. Blair, 256 Ala. 650, 57 So.2d 64 (1952).
The severance deeds before us in these two appeals grant expansive rights to "all coal" and "minerals" contained within the respective lands. Neither instrument bears any limiting language that would indicate that the grantor intended to retain any portion of any substance that could be characterized as a part of the coal or intended to grant anything less than total control over such a substance. On the contrary, both deeds clearly reserve for the owners of the land only surface rights. When the intentions of the grantor can be ascertained from the face of the instrument, rules of construction need not be applied; the law must assume that the parties intended what is plainly and clearly set out. Camp v. Milan, 291 Ala. 12, 277 So.2d 95 (1973). We therefore hold that the ownership of methane gas, with the accompanying rights to drill for this substance, was necessarily included in the mineral estates granted in the instruments. The summary judgment entered for McKenzie Methane in each case is hereby affirmed.
1911093 AFFIRMED.
1911488 AFFIRMED.
HORNSBY, C.J., and MADDOX, ADAMS, HOUSTON and INGRAM, JJ., concur.
ALMON, J., concurs in the result.
SHORES and STEAGALL, JJ., dissent.
SHORES, Justice (dissenting).
I respectfully dissent, because I believe that the deeds in these cases are ambiguous, and that the ambiguity presents a genuine issue of material fact involving the intention of the parties, thus precluding summary judgment.
I believe the trial courts in these two cases erred in holding, as a matter of law, that the parties to the deeds could have contemplated the conveyance of coalbed methane gas, which was of no commercial value when the leases were made. As to the interpretation of when mineral rights are conveyed, the United States Court of Appeals for the former Fifth Circuit (interpreting Alabama law) has stated:
"The meaning of the term `minerals,' as used in any particular grant or reservation, is not to be determined by the adoption of rigid and arbitrary definitions, but from the language of the grant or reservation, the surrounding circumstances, and the intention of the grantor, if it can be ascertained."
United States v. Harris, 115 F.2d 343, 344 (5th Cir.1940). The intent of the parties to a deed of mineral rights as to what property is conveyed may be ascertained by reference to facts existing when the instrument was made and as to which the parties may be presumed to have had reference. Exxon Corp. v. Waite, 564 So.2d 941 (Ala. 1990).
The intent of the parties to a conveyance of mineral interests has been defined as being "consistent with and limited to those minerals commonly known and recognized by legal or commercial usage in the area where the instrument was executed." Western Coal & Mining Co. v. Middleton, 362 F.2d 48 (8th Cir.1966), quoting Ahne v. Reinhart & Donovan Co., 240 Ark 691, 401 S.W.2d 565 (1966). This Court has said:
"There is no general definition in the cases of the term `mineral,' Cole v. McDonald, 236 Miss. 168, 109 So.2d 628 (1959), and in determining what is included within a reservation or grant of minerals, it is commonly stated that the meaning of the term is to be ascertained from the language of the instrument and the surrounding circumstances evidencing the intention of the parties. See United States ex rel. Tennessee Valley *1310 Authority v. Harris, 115 F.2d 343 (5th Cir.1940) applying Alabama law; Vang v. Mount, 300 Minn. 393, 220 N.W.2d 498 (1974)."
W.S. Newell, Inc. v. Randall, 373 So.2d 1068, 1069 (Ala.1979). "Although there is no precise definition of the term `mineral,' it necessarily implies a substance rare and exceptional in character possessing special value...." Id. at 1070.
There is no dispute that there was no commercial value to coalbed methane gas when the conveyances in these cases were made. McKenzie Methane's land manager, Mr. Clark, testified by deposition in the Traywick case that it was not until the 1970's that the technology made it commercially feasible to extract coalbed methane gas. In fact, until that time, the presence of the gas presented a serious hazard in coal mines. Therefore, I do not believe the parties to the conveyances could have contemplated, or intended to convey, the right to drill for methane gas. Certainly, the question of their intent creates a genuine issue of material fact, precluding summary judgment. See Rule 56(c), A.R.Civ.P.
STEAGALL, J., concurs.